# UNITED STATES DISTRICT COURT

NORTHERN _____ DISTRICT OF ___ILLINOIS, EASTERN DIVISION___

UNITED STATES OF AMERICA

v.

RICHARD E. WARREN,
DAVID L. MYATT, and
FRANK L. COWLES

**FILED**

NOV 1 0 2005
Nov. 10, 2005
**MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT**

# 05CR 921

CRIMINAL COMPLAINT

MAGISTRATE JUDGE BROWN

CASE NUMBER:

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Beginning no later than March 2005 and continuing until approximately November 10, 2005, in _Lake Forest, Illinois_ and elsewhere in the Northern District of Illinois, Eastern Division, defendants did,

knowingly devise and intend to devise, and participated in, a scheme and artifice to defraud certain investors, and to obtain money and property from a hedge fund by means of materially false and fraudulent pretenses, representations and promises, and on or about November 9, 2005, for the purpose of executing this scheme, and attempting to do so, defendants did knowingly cause to be transmitted by means of wire and radio communication in interstate commerce signals and sounds, namely a phone call between defendant DAVID L. MYATT, in California, and an individual, in Lake Forest, Illinois, in which they discussed profits from the funds that were obtained and kept through false representations, in violation of Title _18_ United States Code, Sections _1343 and 2_ .

I further state that I am a Special Agent, with the Secret Service and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

DOCKETED
DEC 05 2005

Continued on the attached sheet and made a part hereof:  _X_ Yes  ____ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

___November 10, 2005_____      at   ___Chicago, Illinois_____
Date                                                      City and State

___GERALDINE SOAT BROWN, U.S. MAGISTRATE JUDGE___      _Geraldine Soat Brown_____
Name & Title of Judicial Officer                                                Signature of Judicial Officer

STATE OF ILLINOIS        )
                         )
COUNTY OF COOK           )

## AFFIDAVIT

I, Jonathan Sawant, having been duly sworn, state as follows:

1. I am employed as a Special Agent with the United States Secret Service, at Chicago, IL and have a total of approximately 6 years experience working as a Special Agent. In this capacity, my duties and responsibilities have included investigating fraud, and conducting criminal investigations of individuals and businesses alleged to have violated federal criminal laws, including wire fraud and mail fraud.

2. This affidavit is based upon interviews of witnesses, a review of documents, and information received from other law enforcement agents and other individuals. Because of the limited purpose of this affidavit, I have not set forth all of the information obtained in the course of this investigation.

3. This affidavit is submitted in support of a criminal complaint, alleging that Richard E. Warren ("Warren"), David L. Myatt ("Myatt") and Frank L. Cowles (collectively referred to as the defendants) have each knowingly and intentionally committed acts in violation of 18 U.S.C. §§ 1343 and 2 (wire fraud).

4. As set forth in more detail below, there is probable cause to believe that beginning no later than March 2005, and continuing

1

until at least November 10, 2005, the defendants made material false representations to a hedge fund operator (hereinafter referred to as "Individual 1"), in order to obtain and keeps funds in the custody and control of the hedge fund. Those false representations included statements concerning how funds would be used, how funds had been used, where the funds were, and why the funds could not be returned to Individual 1. The defendants each falsely represented that the investment program was being run by an Administrator from the Federal Reserve, and that the hedge fund's $25 million was being held by that Administrator. In fact, according to a representative of the Federal Reserve, the Federal Reserve does not participate in any private investment programs.

5. As set forth in more detail below, there is probable cause to believe that beginning no later than March 2005, and continuing until November 10, 2005, the defendants intentionally devised and intended to devise and participated in a scheme and artifice to defraud and to obtain money and property from the hedge fund, by means of materially false and fraudulent pretenses, representations, promises, which scheme is further described below, and that, in furtherance of the scheme described below, on or about November 9, 2005, the defendants did knowingly cause to be transmitted by means of wire and radio communication in interstate

commerce signals and sounds, namely a phone call between defendant Myatt, in California, and Individual 1, in Lake Forest, Illinois, in which they discussed the profit from the funds that were obtained and kept through false representations, in violation of Title 18, United States Code, Sections 1343 and 2.

6. According to Individual 1, from approximately 1992 through 2005, Individual 1 managed and operated a financial services company, that managed money market accounts and invested funds on behalf of individual investors. In or about approximately 2003, Individual 1 created a hedge fund which currently has approximately 22 investors, who invested a total of approximately $25 million, which included approximately $2 million of Individual 1's own funds. Individual 1 has no criminal history.

7. On or about October 5, 2005, Individual 1 contacted the U.S. Secret Service. On or about October 18, 2005, the U.S. Attorney's Office for the Northern District of Illinois gave Individual 1 a proffer letter. On or about that date, Individual 1 began cooperating with the government.

8. According to a Choicepoint report, a company known as American Trade Industries, Inc. (ATI) was incorporated in Nevada on 5/23/05. Richard E. Warren is listed as the President. Frank L. Cowles is listed as the Secretary.

9. According to records from the Securities and Exchange

3

Commission (SEC), in or about 1998, a federal court issued a permanent injunction against Warren that prohibited him from violating certain anti-fraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934. The court also ordered that Warren and his company disgorge $7.2 million. The SEC's complaint charged that Warren and his company raised approximately $8 million from investors through two fraudulent securities offerings, and that Warren misrepresented, among other things, the existence of prime bank debenture instruments, the use of investor proceeds, the rates of return, and the risks associated with the investment.

10. Individual 1 provided a written summary to the government concerning what took place between March 2005 and October 2005 in connection with the instant matter, that included the following information:

a. In or about March 2005, Myatt told Individual 1 that there was an opportunity for Individual 1 to invest funds into a trading program. Myatt said that a new company needed to be formed, which should be incorporated in Nevada. Myatt submitted paperwork in Nevada to incorporate a new company, hereinafter referred to as Company 1. Myatt was listed as the Secretary and Director of Company 1, and Individual 1 was listed as the President.

b.   Myatt stated that he was an associate member of ATI, which would be responsible for trading the funds that Individual 1 would invest.  Myatt said that Richard E. Warren was the President of ATI and that Warren was responsible for the trading.

c. Myatt and Warren told Individual 1 that the funds would have to be moved to Europe, because their trading took place in Europe.  Warren and Myatt guaranteed that the only person who could move the funds would be Individual 1, and that the funds could be moved only if Individual 1 gave written instructions directly to the bank.

d.   On or about April 22, 2005, Individual 1 received a letter from Myatt personally guaranteeing the funds.  [Individual 1 provided a copy of that letter to the government.  The letter, which is signed with the name David Myatt, and dated April 22, 2005, stated that Myatt took "full personal and legal responsibility for the safety and full return of the $20,000,000" that Individual 1 sent to a bank in Italy.  The letter also stated that Myatt guaranteed that the funds would "not be depleted and will remain in full" in the Italian bank account until Individual 1 directed that the money be returned to a bank in Chicago.]

e.   Individual 1 was instructed to move funds from Chicago to a bank in Italy, Meliorbanca.

f.   On or about April 22, 2005, Individual 1 directed

5

J.P. Morgan Chase Bank to send $20 million to Meliorbanca in Italy. [According to bank records from Chase Bank, those funds were sent to Meliorbanca in Italy on or about April 22, 2005.] On April 27, 2005, Individual 1 received a letter from Meliorbanca confirming that $20 million had been received by Meliorbanca.

g. Warren told Individual 1 that the funds being held in Meliorbanca would have to be moved to another bank because Meliorbanca was not being cooperative in receiving trading profits into the account.

h. On or about June 29, 2005, Individual 1 signed a document, [which also contains the names David L. Myatt and Richard E. Warren signed on it], authorizing another individual, Bino Giovanni Hogan [Hogan], to move the funds out of Meliorbanca.

i. On or about July 11, 2005, Individual 1 caused J.P. Morgan Chase Bank to transfer an additional $5 million to Meliorbanca. Thus, the total amount that Individual 1 sent to Meliorbanca was $25 million.

j. On or about August 26, 2005, Individual 1 received a copy of a letter [allegedly addressed to Company 1, and Bino Giovanni Hogan, which was allegedly from Vento Banca in Italy] stating that $25 million was on deposit at Veneto Banca.

k. Individual 1 talked to Warren and Myatt about this letter, which had been addressed to Hogan, and which she believed

gave Hogan authority over the funds.  Individual 1 requested that her name be placed on the bank account in order to regain control over the funds.  Warren said that the funds were going to be moved to HSBC in Frankfurt Germany, and that they would be receiving a statement shortly thereafter, confirming the receipt and deposit of the funds.

l.  In or about August 2005, Individual 1 received a payment of approximately $1.6 million. In or about September, Individual 1,  received two payments totaling approximately $1.8 million.  Individual 1 understood those payments, which totaled approximately $3.4 million to be profit distributions.

m.  Individual 1 made repeated requests for statements from HSBC, but did not receive such statements.

n.  On or about September 23, 2005, Individual 1 faxed a request to Veneto Banca asking for a bank statement.  On or about September 27, 2005, Veneto Banca [allegedly] sent a fax stating that they could not release any information to Individual 1.

o.  On or about September 20, 2005, the SEC began an audit of Individual 1's company.  Individual 1 told Myatt that the SEC was extremely concerned, as Individual 1 was, with Individual 1's inability to produce any current bank statement and the accountability of the funds.

p.  On or about September 26, 2005, Individual 1 wrote a

letter to Myatt demanding that the funds to be returned.

q. On or about September 26, 2005, Individual 1 received a letter [with the name David Myatt signed on it, stating that Individual 1 should send a written request to ATI, Inc. to the attention of Warren, "as he is the direct contact with the European bank."]

r. On or about September 27, 2005, Individual 1 wrote a letter to Warren, demanding the immediate return of the funds.

s. On or about October 5, 2005, Warren told Individual 1 that she would have a bank statement by October 7, 2005, which would show the $25 million and profits earned, and that the funds would be transferred back to Chicago.

11. On or about October 18, 2005 and November 10, 2005, Individual provided information pursuant to a proffer letter, which included the following:

a. Individual 1 said that it was her understanding that the investment with ATI would involve the trading of all types of bonds and the trading of collateral.

b. Myatt said that Warren would do the trading, that the money would have to moved to Italy, and that Individual 1 would have control over the money. Myatt said that the funds would remain in Company 1's account and would not have to leave the account for the trading to occur.

c. Myatt said that it was a three week investment with 10% profits a week.

d. At the end of three weeks, Warren said that there were $10 million in profits. Warren said that he was having difficulty moving the $10 million profit into the Meliorbanca account. At the same time, Warren presented a second investment opportunity in which Individual 1 would re-invest the $20 million principal, together with the $10 million profit. Warren said that he needed another $5 million from Individual 1 because they needed a certain amount of money for the investment. Warren stated that ATI would invest approximately $10 million because the Fed Administrator wanted an investment totaling approximately $45 million. Warren said that the investment would be a one year investment, which would have substantial profits, and that funds would not leave the bank account in which they had been deposited. Warren said that after Individual 1 had made the investment, she would immediately get the $25 million principal back and at the end of one year she would receive the $10 million profit, as well as an additional profit that was substantial.

e. Individual 1 spoke to Myatt and Warren on the phone before investing. Warren said he was a trader, and he worked in Washington, D.C. with the highest levels of government. Warren said that he made investments for the government by raising money

9

for humanitarian relief.

f. After she invested, Warren said that he could not move the profits from his trading to Meliorbanca because the Italian Central Bank associated Company 1's name with a terrorist organization. That issue was eventually resolved, but Warren said that the Meliorbanca was being uncooperative and the money needed to be transferred to another bank.

12. The Federal Reserve issued a letter on May 20, 2002, concerning certain financial fraud schemes. That letter is posted on the Federal Reserve website at www.federalreserve.gov/boarddocs/ srletters/ 2002/sr0213.htm. The letter states that the "Federal Reserve does not guarantee or enter into transactions with individuals." Moreover, it state that "Federal Reserve staff has reviewed numerous illicit transactions and...has identified... hallmarks or "red flags" associated with many fraudulent financial instrument scams", which include the following:

a. "Promises of extremely high, unrealistic rates of return with little or no risk." [In this case, the defendants have represented that Individual 1 made a profit of $10 million in three weeks by depositing $20 million into a bank account, with no risk].

b. "Terms that have no meaning in legitimate financial transactions are used repeatedly - for example,..."funds of good, clean, clear and non-criminal origin". [Defendants gave Individual

10

1 a letter on the letterhead of Veneto Banca, in Italy, allegedly confirming that the $25 million had been transferred to Veneto Banca, which uses almost exactly the same language: "We Veneto Banca Sopari, also confirm these funds to be good, clean, cleared of non-criminal origin".]

    c.  "The investor's funds are absolutely safe and cannot be lost. [The defendants' said that the funds were absolutely safe because Individual 1 had control over the bank account].

    d.  "Involvement of a well known governmental authority, such as the Federal Reserve". [The defendants claimed that the Federal Reserve is controlling the this investment].

    e.  "Investor's funds will be used for "humanitarian projects". [The defendants claimed that they were investing in humanitarian projects.]

    13.  On or about October 21, 2005, Individual 1 flew from Chicago, Illinois, to Washington D.C. to meet with Warren. According to Individual 1, she was met at the airport by Frank Cowles, who drove her to the meeting with Warren at a hotel. According to Individual 1, she met with Warren and Cowles, and the following took place:

    a.  Warren said that he was trying to get the funds back, and he was trying not to have the funds frozen. Warren said they had replaced the funds from Individual 1 with funds from another

investor. There was some paperwork that needed to be signed, but it should be taken care of by the next day, and then her funds could be returned. Warren said that this could happen the next day, [October 22, 2005], and no later than the middle of the next week [October 26, 2005]. Warren said that if it did not happen the next day [Friday], it was because the Italian banks typically release bank statements on Wednesdays, which would be the next week.

b.    Warren said that Hogan had met with the Fed Administrator to ensure that Individual 1 would get her funds back, and would get a bank statement concerning the funds.

c.    Warren said that he had been fined by the SEC and that he had paid $5 million for co-mingling funds with his attorney. Warren said that he had a special clearance to deal with the federal government.

14.    On or about October 25, 2005, Individual 1, who was cooperating with the government, tape recorded a phone call with Warren, which included the following:

a.    Warren said that Company 1's funds were going to be moved to a disbursement account "today", and if that happened, the funds should be returned by the end of the week [October 28, 2005]. Warren said that some documents were being sent for signature, and once the documents were signed, the funds would be released,

together with the profit. Warren said that the documents would be coming from the "Fed Administrator", [which appears to be a reference to someone at the Federal Reserve]. Warren said that a bank statement would show that Company 1 had $35 million, and that Warren's company, ATI, had $10 million. Warren said that within the next few days Individual 1 would have a bank statement showing $35 million in the account, [which included the $25 million investment and an additional $10 million of profit].

b. Individual 1 asked whether she could call the bank directly and get any information regarding the account. Warren said that the bank was a pass through bank, and she would not be able to get any information from them.

c. Warren said the instructions had already been given, and that he was the one who gave all the instructions. He said that Individual 1 had given him a written directive and that he was returning the funds to the same account from which they came. [This appears to be a reference to Individual 1's letter to Warren, dated September 27, 2005, directing that the funds be returned to Chicago.] Individual 1 agreed and said that she wanted those funds to go right back into the accounts they were taken out of at [J.P.] Morgan. Warren agreed and said that that is where they are going. Warren said that he had already given those instructions.

d. Warren said that [ATI] also had $10 million at stake

13

as well. Warren said that they had earned $20 million plus dollars, and that $10 million went to ATI, and $10 million went to Company 1.

e. Individual 1 said that she appreciated that Warren and Frank Cowles met with her. [This appears to be a reference to the meeting on October 21, 2005]. Warren said that the meeting was long overdue, and they should have met with her before.

f. Warren said that he has been in this business 22 years. Warren said that they controlled the program, and have control of it from start to finish. He said that they controlled when they pay the proceeds out, and they controlled the auditing. Warren said, however, that they had a federal overseer that oversees everything they do, and they have to get clearance.

g. Warren said that ATI was going to get less than $1 million, because a charity, Educate America, was going to get the bulk of the $10 million that ATI earned, and there was a large team [that had to be paid] including Hogan and Cowles.

15. According to Individual 1, on or about October 28, 2005, Individual 1 received a document entitled Settlement Agreement, which provided that Company 1 and ATI each agreed to release all claims against the other company; Individual 1 signed the document and sent it to Warren.

16. On or about October 31, 2005, Individual 1 had a tape

14

recorded conversation with Myatt, which included the following:

a.   Individual 1 asked why a Fed Administrator would look at any of the documents. Myatt said that their position came from the bosses that oversee the trading, at the Fed level. Myatt said that they are the ones that balance the U.S. currency all over the world of the accounts they oversee. Myatt said that many of the overseers are attorneys and they want to make sure everything is done, so that there are no open windows or open doors, and that is the format the Fed calls for.

b.   Myatt said that they are concerned about prudency, and that it is the Fed Administrator's job. Myatt said that the Fed Administrator has people above him calling the shots. Myatt said that this is an industry that is different, and it is a world away from a traditional way of doing commercial business. Myatt said that it is a nonexistent, nonconfirmed industry that exists; they are in a different league, and there is no rhyme or reason for it.

17.   On or about November 1, 2005, Individual 1 had a tape recorded conversation with Cowles, which included the following:

a. Cowles said that he had talked with Warren and all necessary paperwork had been submitted to the Fed Administrator, and he was expecting to receive a wire on Friday [November 4, 2005]. Cowles said the Fed Bank was on a three day holiday so the

15

monies might come a little late.

b. Individual 1 asked what bank the funds would come from. Cowles said he did not know. Cowles said that based on his experience, no one ever knows what bank.

c. Cowles said that the monies are routed to a disbursement bank and from there to a bank in the United States. Cowles said that the purpose is to mask the transaction so nobody will be able to "back-track" and identify the investor.

d. Cowles said that the Fed Administrator has the final authority concerning when the monies will be returned. He said that Warren was in Washington on business and will not be able to communicate for the remainder of the day.

e. Cowles said that he was the Chairman of the Virginia Bank of Commerce and he was one of the founding members of the Virginia Bank, which has assets of approximately $1.6 billion. Cowles also said that he was on the Board of Directors. [A representative of the Virginia Commerce Bank stated that Cowles is on the Board of Directors for the Bank at this time.]

18. On or about November 3, 2005, Individual 1 had a tape recorded conversation with Myatt, which included the following:

a. Myatt said that the Federal Administrator wanted representatives for Company 1 and ATI to sign a Settlement Agreement, with all of the original signatures on one document.

Myatt said that when that document was completed, the funds would be released on Monday or Tuesday of the following week.

b. Individual 1 said that she knew of a private investor willing to invest up to $200 million and asked what type of collateral is needed. Myatt indicated that there would be "AAA Paper" issued and other various instruments. Myatt said that there would not be much Federal regulation because the money could be held in a European bank.

c. Individual 1 asked why ATI does not have websites, literature, or verification process authenticating what ATI really does and Myatt responded that most of his clients have the capability to hear the name and verify their credibility through the Fed. He also stated that ATI belongs to an exclusive industry and only the "supplicated" investor knows the protocol on how this industry functions, basically in anonymity.

19. On or about November 3, 2005, Individual 1 had a tape recorded conversation with Cowles, which included the following:

a. Cowles said that he would personally take the documents to Warren for signature, and they would take the documents to Myatt for signature. Cowles said that they would send the documents to the proper authorities so the wire could be cut [which appears to mean so that the funds could be returned].

b. Cowles said that Warren had talked to the Fed

17

Administrator at approximately 3:00 a.m. in the morning and they had received the documents [the Settlement Agreement] but it was unacceptable because all of the signatures did not appear on the same document; they needed one document with all three signatures.

c. Cowles said that Warren's connections at the Federal Reserve Bank in D.C. were key to getting the money back. Cowles said that the Fed Administrator had accepted all of their terms and they would get the money as soon as the Fed Administrator receives the documents.

20. On or about November 9, 2005, Individual 1 had a tape recorded conversation with Warren, which included the following:

a. Warren said that the Fed would send Company 1 the profit that had been made, but that the Fed would not send the $25 million principal. Warren said that ATI and Individual 1 were on thin ice with the Fed Pool Administrator and his boss.

b. Individual 1 asked if the Fed was happy with the Settlement Agreement and Warren said that the Fed Administrator was not happy about it because the Agreement said that ATI should pay Company 1 and that is not proper procedure.

c. Warren said that the Fed will send Company 1 the profit, and Myatt will get $500,000 out of those funds. Warren said that after Individual 1 got that money, the Fed Pool · Administrator would release the remaining $25 million to Company 1.

18

d. Warren said that he was going to London today [November 9, 2005]. Warren said that he will be meeting with the Fed Administrator with the Federal Reserve at the Embassy in London.

e. Individual 1 asked about the problems that had previously arisen at Meliorbanca, the bank in Italy. Warren said that he had been contacted by the Central Bank of Italy regarding terrorist connections with Company 1 in Italy.

f. Warren said that his money, the advance money of $3.4 million is locked up in this investment too. Warren said that he is working on the Educate America program with Laura Bush.

21. On or about November 9, 2005, Individual 1 had a tape recorded conversation with Cowles, which included the following:

a. Cowles said that the Fed Administrator called Warren at 3:30 this morning. Cowles said that Individual 1 is afraid of the SEC finding out that ATI is paying her. Individual 1 said that she wanted the payments to be consistent, and changed the subject.

b. Cowles stated that Warren is leaving for London today [November 9, 2005] and that Cowles is leaving for Hong Kong on Saturday [November 12, 2005].

c. Cowles said that Warren was disconcerted that the Fed Administrator changed the rules of the payment, and that Warren was upset that Individual 1 had them change the Settlement Agreement so

19

that the SEC would not come in and try to take everything.

d. Cowles talked about two different trading opportunities and Individual 1 said that she was going to talk to Warren this afternoon.

e. Cowles said that the funds will be released by the Fed Administrator after Individual 1 paid Myatt. Cowles said that the Fed Administrator will not release payment until Individual 1 shows proof of paying Myatt.

f. Cowles stated that Individual 1 was not truthful with them and that Individual 1 gave them a false affidavit. Cowles said that Individual 1 lied to them about what she did versus Myatt.

g. Individual 1 stated that Myatt was untruthful to her and that her trust with Myatt was the problem. Individual 1 said that she did not deliberately defraud ATI. Cowles said that this is the last time that he or Warren put one of these deals together without meeting the party directly.

22. On or about November 9, 2005, Individual 1, who was in Lake Forest, Illinois, received a telephone call from Myatt. I observed that the caller identification showed a California area code for the incoming call. Individual 1 had a tape recorded conversation with Myatt, which included the following:

a. Myatt said that Warren had called him after Warren

20

spoke to Individual 1. According to Myatt, Warren said that the process had changed and Warren was frustrated.

b. Myatt said that the profit from the investment was being sent to Individual 1. Individual 1 said she would remit the 5 to Myatt [which appears to mean $500,000]. They would then put together an agreement saying that it had been taken care of in whole. Warren would let Myatt know where Warren was in London, so Myatt could send copies of the agreement to Warren.

c. Myatt said Warren had given him a list of things that needed to be collected before Warren left; Warren has a lot of things going on at once, including things in London and Frankfurt. Warren is also going to Asia. Warren is handling a transaction in Frankfurt for Myatt, and may be handling another transaction as well.

d. Myatt said that Cowles is going to meet Warren in Hong Kong. Myatt said that ATI bought a plane, a G4, worth $50 million, that can go as far as Europe, but not Asia, but Myatt did not know whether they would be taking the plane.

23. On or about November 10, 2005, Individual 1 had a tape recorded conversation with Cowles, which included the following:

a. Cowles said that Warren had not been able to get a plane ticket, and therefore had not gone to London. Cowles stated that Warren would be going to London on Friday [November 11, 2005]

21

or Monday [November 14, 2005].

b. Cowles said that Warren was going over to provide documents to the Fed Administrator in Europe. According to Cowles, the Fed Administrator said that he was not going to be able to release the funds until Monday, November 14, 2005, and that providing the original signatures on the documents would allow for the release of the money.

c. Cowles said that the Fed Administrator would release the profits to Individual 1. She then had to pay Myatt $500,000. Once they could prove to the Fed Administrator that Myatt had been paid, then the Fed Administrator would release the $25 million.

24. On or about November 10, 2005, a Secret Service Special Agent, acting in an undercover capacity, had a tape recorded conversation with Cowles, which included the following:

a. The agent introduced himself and said that Individual 1 told him about a possible investment opportunity with ATI, and that he was interested in learning more about the investment opportunity.

b. Cowles said that they did investments through ATI. Cowles said that they needed someone who had a corporation to do the investment. Cowles asked that a letter of introduction and some financial information be sent to him.

25. According to a representative of the Federal Reserve, the

22

Federal Reserve does not participate in investing private funds.
The Federal Reserve does not have a federal administrator that
deals with people investing money on behalf of the government or on
behalf of the Federal Reserve Bank.

26.    According to Individual 1, and based on the phone
conversations, the $25 million has not been returned to date.

27.    It is respectfully requested that this Court issue an
Order pursuant to which this affidavit may be filed under seal.
Premature disclosure of the contents of the affidavit may have a
negative impact on the success of the investigation in gathering
evidence of these crimes.

28.    I verify that the information in this affidavit is true
to the best of my knowledge and belief.


_____
Jonathan Sawant
Special Agent
U.S. Secret Service


Subscribed and sworn before me
this 10th day of November 2005

_____
HON. GERALDINE SOAT BROWN
United States Magistrate Judge